Thank you, Your Honor. Good morning. David Merchant on behalf of Mr. Barrow. I'm with the Federal Defenders of Montana. This case needs to be remanded for resentencing for two reasons. The first is that the district court attributed two additional levels of relevant conduct for drug weight. We tested that weight at the sentencing hearing, and I think it's fairly well briefed out, but two things I wanted to reiterate to the court. First of all, the district court was simply wrong. There are two types of methamphetamine, just as there are two types of cocaine. The statute and prosecution delineates the two types, and the sentencing guidelines delineate the two types. There were no objections by the government to the pre-sentence report that did, in fact, delineate the two types of methamphetamine. If the district court made a factual finding that the drugs found in the jail was tied to the conspiracy that existed when the two defendants got arrested, do we review that for clear error? Yes, but with that said, there was no factual finding of that. The law is fairly clear, Judge Winn, that to apply for the conspiracy, it has to show that the relevant conduct is both jointly undertaken and reasonably foreseeable by my client. Keep in mind, Your Honor, that the indictment that my client pled to, the conspiracy, ended on the day of their arrest. The drugs that were found in the jail were found six weeks later, totally different drugs. Isn't it just a question of where they came from? It absolutely is a question of where they came from, and we don't have any idea, Your Honor. Didn't Johnson testify? No, she did. Or rather, admit that in an interview? No, she did not, Your Honor. She brought them into the jail. I'm sorry? Didn't she say she brought them into the jail? She did. Well, where would they have come from then? From her. What are we missing? That my client came from Utah to Montana to sell drugs to a guy in North Dakota. He brought drugs with him. He gave all of those drugs to the person in North Dakota. He had no other drugs. He testified to that, and the police said so on the... Well, it's a conspiracy case. So if you have two individuals engaged in a drug distribution conspiracy, and one person gives all of the drugs he had on him to the buyer, the second co-conspirator concealed the drugs that she had on her person, then the test is reasonable foreseeability and, of course, in furtherance of that criminal activity. This is a conspiracy case. Yes, Your Honor. Right, so didn't the district court look at that, the question of whether it was reasonably foreseeable to your client that his co-defendant had the drugs on her? With all due respect, if the court did that, they didn't do that on the record. There's nothing in the record that ties Mr. Barrow to the drugs Ms. Johnson had. And when I asked, when both police officers testified at the sentencing hearing, they both said, but for their being together, there was no connection. Counsel, Judge Gould, if I could ask you one question to clarify. Is there anything in the record that rules out that Ms. Johnson bought the meth that she brought into the jail, that she bought it from Lewis or some other source, and that it wasn't the meth that Barrow bought? The only thing in the record I would tell you, Judge, is that the two types, the methamphetamine found on Ms. Johnson is chemically different than the methamphetamine that Mr. Barrow brought with him. And Mr. Barrow was, Ms. Johnson was the ride-along. She was, she came with him. The conspiracy, she ends up pleading to just the possession of the methamphetamine that found in the jail. She does not plead to the conspiracy. My client pled to the conspiracy. But, again, the conspiracy was stopped at the time that he was arrested. He testified at the sentencing hearing that she was pregnant, that he asked her to stop using drugs. He admitted that she used drugs prior to that, but that he thought she had stopped. And the trial court clearly didn't believe that conduct, right? I'm sorry? That part of the transcript makes it pretty clear the trial court didn't believe that. And that's the second part of the problem of my argument here is that testimony and that evidence comes in a different hearing. It wasn't part of my hearing, Your Honor. Ms. Johnson was sentenced prior to us. I wasn't a part of that. Mr. Barrow wasn't a part of that. It's a function of the trial court addressing your client about whether he understood that she was using methamphetamine on a daily basis. That's what I'm referring to? Yes, but that wasn't part of our hearing at all. That's not in our record. That comes from the hearing that was done before with Ms. Johnson being sentenced and the police officer saying, I interviewed her in July of 2013. Remember, the arrest takes place in January, in which she says I was using up to a quarter gram of methamphetamine a day. We have no time period. They didn't ask where those drugs came from. The record is absent of all of that. My point was that the judge didn't believe your client's statement that he didn't know she was using. And my problem is, I understand, as I read the record, she admitted that she brought the drugs into the jail with her, and there's testimony that the amount she brought in was not consistent with personal use. So I'd like to give you an opportunity to tell me what we're missing. You're missing that there's the – that is part of a record of a different case, Your Honor. That had nothing to do with Mr. Barrow's hearing, Mr. Barrow's sentencing hearing. That's why I go back to my clear error question. Okay. Because it seems to me that the district court made a factual finding that the drugs found in her cell or found in the jail facility were drugs attributable to the conspiracy. And I'm looking at the excerpts of record. So I'm asking you whether the court clearly erred in making that factual finding when he said that the drugs ultimately found in her cell, and I'm looking at volume two of the excerpts of record, page 146, by all evidence before the court had an earlier time been concealed by her in a body cavity, which to some extent avoided her search because of claims of pregnancy. It is my determination, based on the record, that these drugs that were found in Johnson's possession inside her cell are drugs which were a part of this conspiracy and which she was a part of, and therefore the drugs should be included and counted as part of relevant conduct. That sounds to me like a factual finding. It absolutely is. I'm just telling you that the judge clearly erred. That wasn't part of our factual basis. If I can move on, I think the more better argument I have is the acceptance of responsibility. We're asking the court to actually overturn Johnson, which this court decided in 2009, where the appeal waiver was a valid reason to deny the third point of acceptance. What has happened subsequently, obviously, is the Fourth Circuit decides Divens and says, nope, appeal waivers aren't reasonable. That's 2011 for the denial. A month later, the Second Circuit decides the same thing with an evidentiary hearing and a sentencing in U.S. v. Lee. This court decides Jimenez in March of 2012. It affirms the denial of the third point because of Johnson, but the concurrence in that case supports Divens. We then go to the Amendment 775 of the sentencing guidelines. Those come out, the advice and comment come out in that case in April of 2013, Your Honors. They go into effect November 1st of 2013. Our sentencing takes place October 28th. Between that, between Johnson, Divens, and Lee, we have Jimenez from this court. We also have Ortiz that comes out in September of 2012. That affirms the denial of third point because of precedent in this thing, but invited the defense to an en banc ruling to overrule Johnson. Step forward. We now have, last November, the third point changes, and this court in Revere Rays in which Judge Wynn, who sat on that, he said in light of the November 2013 amendment, failure to waive appeal is not the grounds to deny the third point. I think that's explicit in Application Note 6 as amended, that the refusal to waive appeal can't be a basis for denying the third point. As one raises, but if you go back and read Divens and then Lee, all we did was ask for an evidentiary hearing on the weight. We weren't trying to deny the efficient trial. The plain reading of the statute and of the amendment says trial. It has nothing beyond that. And with all due respect, we weren't raising a frivolous argument to the hearing. The government had to call witnesses. It wasn't frivolous, and they didn't expend any energy, any cost for trial. Trial had already been done. The plain language requires that this be remanded. 3E1.1 was not drafted to conserve resources by eliminating defendant's statutory and constitutional rights, period. We're required to have accurate PSRs. So a defendant who pleads guilty has a due process right to contest errors in the pre-sentence report. We believe there was an error in the calculation because of the two different types of methods. We understand your argument. You're out of time, but one moment, please. Let's just we've asked a number of questions. I want to make sure Judge Gould has had an opportunity to ask his. Yes, I think I have. Thanks. All right. Counsel, we'll give you a couple minutes on the clock for rebuttal. Thank you. You bet. Thank you, Your Honor. I'm Mike Lahr from the District of Montana here on behalf of the United States in this case. And just to continue the discussion on the first matter, which had to do with the relevant conduct, there is certainly, as I think the Court has noted in the excerpts of record, there is clearly an adequate record to support the judge's findings. In this case, he did make a very clear finding. What supported the factual finding that the drugs found in the jail was attributable to the conspiracy? Was there an admission that she had the drugs on her? Can you tell me about that and point me to that portion of the record? I think that probably the two key things, and I think the panel has referred to them, there is I believe 138 in the excerpts of record, which is Jeffrey Needham's. And then on page 94 of the excerpts of record where Mr. Marco, I believe, is discussing. The two questions are, again, they're coming in as hearsay, but they have interviewed Cindy Johnson, and he has asked a question during the first sentencing hearing. He is the Department of Corrections investigative analyst, and he has asked and he states she said that she hid three ounces of methamphetamine within her garments at the time she and Mr. Barrow were arrested. That law enforcement didn't find? That law enforcement, the reasonable inference is we know that ultimately she had 47 grams about six weeks after the arrest. Working back in time during that time that she is in the detention center, you have issues being raised about methamphetamine use in her wing in the detention center. But on January 12th, just about a day and a half to two days afterwards, she in fact, they do go back and search her clothing, and they find 2.8 grams of highly pure meth that has been hidden in her clothes. She follows up subsequently and tells law enforcement, I smuggled in three ounces of methamphetamine. That evidence comes in twice during this hearing, three ounces of meth that she has secreted away, hidden, and smuggled into the jail. The 2.8 grams that is found, reasonable inference that that is part of that. The 47 grams that is later found is the remainder of what would have been about 85 grams or three ounces of methamphetamine. Both the amount that they found on January 12th as well as the 47 grams that they ultimately found at detention were all of a very high purity, 87%, 88%, 89%. So there is consistency in the meth that they found. There is consistency in what she said. Counsel, I'm just trying to get in a word of advice. I appreciate that response, but could you, in the process of this, could you clear up the confusion about, there's two areas of confusion, and I think you're kind of just right on top of that. So I'll just ask the question now. One is they say that the drugs were found in West 101. Is West 1 the wing? Correct. That's the wing where she was in the detention center. Is 01 her cell? I'm not sure if that is a cell or a pod. Okay. So here's the problem. I think your position is that this is attributable to her, all of it, but some of it was found in underwear, and even that is pretty tough to trace through because at one point it says it's in a plastic sack with some underwear that she was not wearing, and at another point that there's panties with a hidden pocket sewn into them, and it's not easy to trace what the record is trying to tell us about how this was discovered. But as to the methamphetamine that was found in the jail, it talks about it being wrapped in a bundle in electrical tape and it's found in West 101. The judge on record said it was found in her cell. That's why it's really difficult for me to connect those dots. So in the process of answering Judge Wynn's question, could you explain that as well? I understand the purity. I understand that. Yeah. Obviously the record is what it is, and I think that when you track everything forward, the idea that she has found it, she apparently had somebody working with her as well inside the jail. There were the two different packets, one of the 46-point-something and the .32 grams. They talked about them being taped. Again, not positive from the record whether it is her actual cell. The judge did say that or just a pod, and this is her cellmate. Is that supported by the record, the judge's statement that it was found in her cell? I believe that the statement is accurate, but I would have to— I sure couldn't find it. I can't say for sure. It does say the O1. We know it's in the right wing. There are reports or kites sent out that we know who the source of the meth is in West 1, and ultimately, at least in her area, her pod, if not her cell, is where these packets are found. But beyond that, no, there's nothing further beyond that. So I was really trying to trace this through the record, and then I came across what I referenced earlier, which is this interview with Agent Leedens. I think there are actually two. So then I want to fast forward, if I could, and ask you to focus on the third point, given that this doesn't strike me as a frivolous factual contention about the quantity of methamphetamine. Is that your position? It is certainly not a—no one is stating that he would not have the right to defend himself, to simply do more than roll over on that. I think the point is based on the evidence and the court's findings, and it goes specifically to his statements in trying to deflect this when you go back to stating that he has no idea that his girlfriend, who is now pregnant, has no idea that she's using meth, denies the fact that he knows that she's a meth addict, claims that there is no methamphetamine, that they have no methamphetamine, that they may have smoked a little bit of marijuana. Counsel, is that on the record in this case? Yes. Because I thought the appellant's lawyer was saying those were on the record in Johnson's case. These are all statements that he made during his testimony. I think counsel was referring that the trial court was perhaps relying on some knowledge that he had acquired in another case when it was questioning Mr. Barrow in this case, but his denials were made in this case, in this hearing. And the court was asking him, is it your testimony that you did not know she was an addict, you did not know that she was using methamphetamine, and in each of those in this case, in this record of the sentencing, he would state, no, I did not know that, I did not have any way of knowing that, and so forth. But that is in this case. I'd like to ask you one more question on this quantity issue. I understand it's accepted, the findings make clear, that the meth that she was dealing was smuggled into the court, or into the jail, rather, at the time of her arrest, or after her arrest. But is there anything in the record that rules out that that meth that she smuggled in was bought by her separately from her conspiracy with Barrow? There's nothing categorically, Your Honor, that could rule that out. So how do we know that she didn't have, like, a mission of her own on the side, and she has her own meth, and it's secreted away in a body cavity, and then she gets apprehended with Barrow, but the meth that was secreted wasn't the meth that he bought? I would say that anything is conceivable, but it is a reasonable doubt standard, and I think the evidence that they traveled together, they were part of the conspiracy, they did have meth. The evidence that there were syringes in the room when he was there, that she was gacked out, according to this hotel clerk, and that she did, in fact, have three ounces on her person when they were arrested, that because of the nature of the conspiracy, the nature of the relationship, what we know about the days leading up to, that the more probable than not is that this methamphetamine was in their possession and that Mr. Barrow knew about it because of the size of the amount. It was a distribution type amount. The purity was such that one would think, based on the evidence, there's ample evidence to, we would argue that, in fact, it was a distribution amount that Barrow did know about. There is adequate evidence in the record to support the judge's claim. It sounds to me like that's a little inconsistent. There's evidence in the record, it seems to me, that she smuggled it in. There's evidence, certainly a reasonable inference, she had it at the time because they were arrested together. And certainly the judge had reason to think she was using it on a daily basis, including the syringes and whatnot. But isn't that inconsistent with the amount being inconsistent with personal use? In other words, I can understand tagging him with knowledge that she was using, but this is an amount that I think, pursuant to your theory, was consistent with sales. And I think that the United States' response to that is simply that, is their conspiracy was interrupted, that she would have such a large amount of high-purity methamphetamine just purely for using herself, and according to Barrow, that he had no idea this was going on, is implausible. But isn't the conspiracy, that's defense counsel's argument, that the conspiracy that there's evidence of them jointly participating in had terminated because they'd made their delivery? Well, I think the conspiracy, and again, it runs until January 13th to the arrest. The point is, is that the agreement is the crime, and they had conspired. We would say there is ample evidence, and the court came to that conclusion, that all of the methamphetamine that they had, not just what they delivered, but what she had, the three ounces that she had, was part of the conspiracy. They had agreed that they would probably use that. So it wasn't a conspiracy just to sell to that individual who got arrested that led back to the defendant. It was actually charged just as a general conspiracy to distribute, right? Right. And we would just say this methamphetamine was other methamphetamine that at least these two individuals had agreed to sell. Hence your reference to the date of the conspiracy in the indictment, that it continued through January 12th or 13th. Is that correct? Right. In other words, the fact that it is ultimately discovered downstream in the timeline does not change the fact that immediately before their arrest, you had two people who had an amount of methamphetamine, what we would say was likely a distribution amount, and that they had every intention of not only using some, but further. Did the government oppose the two points for acceptance of responsibility? The government did not oppose it, although I would presume from the record that it was probably somewhat of a surprise to the government when the court granted the two levels. I'm a little perplexed by the denial of the third point, or the government's refusal to move for the third point, frankly, because acceptance of responsibility, the first two points, that's where the false denial of relevant conduct, the alleged perjured testimony that the government relied on to deny the third point, it really comes in the two-point acceptance for responsibility. So if you think somebody took the stand during a sentencing hearing and lied about something, you can say, well, I think he failed to really accept responsibility because he perjured himself or lied when he said he didn't know that she was using drugs at the time of their arrest. But the third point, the way the guidelines are structured, is really designed for early pleas to save the government resources and to assist the court in managing its calendar appropriately. That third point really doesn't speak to false denial of relevant conduct, does it? And I think Application Note 6 appears to clarify that. So how do you explain the inconsistency in the government's position between agreeing to the two points for acceptance of responsibility and yet refusing to move for the third point? I would explain it in a couple ways. First of all, I don't know that I would use the word agrees. The government did not object, but I think to say that it necessarily agreed with the court's conclusion is slightly different. And I think it's important to look at B. You're exactly correct, and the first thing the United States would say is that there's no disagreement, and, in fact, it readily concedes that if acceptance of responsibility is not an issue, if the evidence is indicative of acceptance, that there's no question that timeliness and allocation of resources are the only basis for refusing. But it would look at 3E1.1, even in subsection B, the very first line states that if the individual qualifies under subsection A. In other words, the first issue is always. That's my question, because the government didn't say that he doesn't qualify under subsection A. It did not, but it did say it objects for all the reasons set forth in that you would set out such reasons for subsection A. So, in other words, as an initial matter, I think the question here really, the question for the court, the interesting legal question is merely because the court makes its determination under subsection A, does that mean that the government has no ability to independently draw its own conclusions based on what it has seen and basically to dispute the court? I think that the two levels are definitely for the court to do. Certainly the court can, certainly the trial court certainly can make its decision that it has seen evidence of acceptance and grant it for that reason. But I see nothing either in the wording or in any case law that would indicate that the government can't disagree. Now, one way it could disagree is it could object to the two points. But if the court maintained and said, no, I believe there's acceptance, I think what the government is looking at is under 3E1.B, that that question, does the individual qualify under A in the first place is an initial matter that the government does have independent basis to do it. I understand your argument. I've taken way too much of your time. You're way over time. Judge Gould, do you have more questions? No, I don't have more questions. Thanks. Thank you. Thank you, counsel, for your helpful argument. Thank you. Could you please put the clock at 3 minutes? Thank you. Go right ahead. I disagree with the opposing counsel. It's timeliness and trial resources period. There was no objection to the pre-sentence report as it was presented to the court, which included the one level from the government. They did not object. We go into the first part of the sentencing hearing, October 7th, came back October 28th, and they did not object to the two levels. The judge was, with all due respect, I was at the sentencing surprised that the government did not move. And the government's only argument was the government, as well as the court, simply doesn't believe the defendant. Well, the court apparently did believe enough to give the two points. It's timeliness. If my client would have walked in on the morning of trial, that's untimely. If we had a plea cutoff date, that would make it untimely. In this case, that's not what happened here. What happened here was the government got frustrated that they had to put on witnesses, and so they wanted to take their ball and go home. They wanted to take their one point. And that's just not right. That's not what it's all about. And I urge the court to review Divens and Lee. And the way that the amendment was even drafted starts out by the Sentencing Guideline Commission saying there are circuits that disagree. The Ninth Circuit has Johnson, but these other two circuits, the Fourth and the Second, have Lee. And you know what? We're siding with the Second and the Fourth Circuit. That's the way the amendment comes down. As far as the drug weight goes, again, I disagree with the government. They came here, Ms. Johnson and Ms. Barrow, for a delivery to a guy in North Dakota. They happened to meet halfway. That's the reason they're in Billings. It was a six-ounce methamphetamine deal. That's what the government said. We had a six-ounce deal. And three ounces make delivery qualities. My client said, yeah, I knew she was using meth before, but then she got pregnant. We had a conversation. She told me she stopped using it. That's his testimony. The court then interrupted my client and said, well, I have other information that she was using drugs. Well, we didn't have that information. And he said, well, I thought she was telling me the truth. He was just as struck, the fact that the court is telling him that she was using drugs. I thought the judge doesn't have to believe him. It doesn't, but the court gave him the acceptance of responsibility. That's where the frivolous stuff comes in subsection A, not B. B is timeliness, wasting resources. That's it. In the A level, we met the hurdle. The court determined that he had accepted responsibility, even though we had the other things going on where he withdrew his plea and then entered his plea. There were other things that the court could have said, you know what, you haven't demonstrated acceptance. But the court gave him those two levels, and the government just didn't want to play nice. That's what happened there. Judge Gould, do you have additional questions for defense counsel? No, I do not. Thank you. Your Honor, the meth found on her is West 1 in the Billings Jail. It's the Yellowstone County Detention Facility. It's just the women's pod. What's O1, West 1 O1? Well, I have no idea. We had no idea what that was. That wasn't her jail cell. That wasn't her inmate number. Was she in a pod? The judge said it was found in her cell. Yes. And what we do know from the record is that the Yellowstone County Detention Facility's deputies searched her cell. I know. They searched the cell. They didn't find it, but it was found in West 1 O1. Right. What happened was there wasn't the kite sent from the inmates to the jailers. It occurred in February. It occurred about four weeks after she had actually been arrested. There was methamphetamine being found in the women's facility, and they blamed these two girls, Johnson and her roommate. That's what was discovered. They searched the cell twice, never finding anything. On the third search, they find that. Yes, but then they interviewed Johnson, and she said she brought it in. In July. In July of 2013, she does. Right. Absolutely. All right. Thank you very much for your argument. Both of you, it was very helpful. We appreciate it, and we'll take this case under advisement.
judges: Gould, Christen, Nguyen